Whaley, Chief Justice,
delivered the opinion of the court:
This is a patent case now before this court for the determination of the amount of compensation to which the plain *212 tiff Shearer is entitled. Plaintiff was in the employment of the United States at the time he made the inventions here in issue, and this case is before us under a special act of Congress (Private Number 285,71st Congress). The act waived the statute of limitations and instructed the court first to determine whether the plaintiff Shearer was the first, original and sole inventor of the inventions described in three Shearer patents pertaining to concrete revetment construction, and if the court should find that he was such first, original and sole inventor, the court was, to quote that portion of the act relating more directly to the accounting,
* * * then to determine, second, what amount of compensation, if any, he is justly entitled to receive from the United States for the use of his said inventions or any of them, since the date of said letters patent, up to the time of adjudication. In determining whether, or not said David McD. Shearer is entitled to compensation and the amount of compensation, if any, for the use of said inventions the court shall take into consideration, if and so far as the facts may warrant, the facts, if proved, that while said David McD. Shearer, was engaged in perfecting the invention he was in the service of the United States as a junior engineer superintendent in charge of willow bank revetment construction under the Mississippi River Commission, and whether and, if at all, to what extent said inventions or any of them were discovered or developed during the working hours of his Government service, and to what extent his said inventions for protection of river channels and banks differ from the methods previously used, in material, method of laying, permanency, and value, and, whether if at all to what extent the expense of making experiments, trials, and tests for the purpose of perfecting said inventions was paid by the United States, and if any such expense was incurred by the United States, whether and, if at all, to what extent the United States received compensation for such expenses. * * *
In the trial of this case on the issues of validity and plaintiff’s right to recover for use plaintiff withdrew any claim on account of Shearer patent 1,173,880, leaving for consideration patent 1,173,879 for an articulated concrete revetment structure, and patent 1,229,152 for an apparatus for launching and sinking concrete revetments.
*213 The court in its special findings of fact and opinion of March 7, 1938 (87 C. Cls. 40), held that claims 3 and 6 of the Shearer revetment patent were valid, and the inventions defined thereby had been used by the United States and that their origin and development were such that plaintiff was entitled to compensation therefor under the special jurisdictional act. As to the launching apparatus patent, the court held that the plaintiff was estopped from compensation because the contribution of the United States toward the development of this invention and its reduction to practice was such as to give to the Government a shop right or nonexclusive license to use the same. In connection with the opinion of March 7, 1938, this case was referred to a Commissioner of this court to take testimony upon the question of reasonable and entire compensation as to the revetment patent, and it is now before the court on this question and on the objections of the parties to the Commissioner’s report. The special act indicated that the amount of compensation be determined “since the date of said letters patent up to the time of adjudication.” Therefore the accounting period is from February 29,1916, to February 28, 1933, the date of expiration of the revetment patent.
Both parties have filed numerous exceptions to the Commissioner’s findings. In general, plaintiff has excepted to the Commissioner’s findings in so far as they have indicated what the plaintiff thinks is a small recovery. The defendant contends that the Commissioner reports an exorbitant recovery for plaintiff; that the Commissioner’s basis for such recovery is predicated upon a false premise and not supported by the evidence, and that plaintiff is not entitled to any compensation or, at best, to a nominal one. It is unnecessary to refer to all of the numerous exceptions in detail except to say that we have considered them, together with additional proposed findings, and we will therefore limit our consideration to what we consider the basic issues.
Defendant’s contention that plaintiff is entitled to no recovery is based upon what it calls “an inconsistency” in the court’s former opinion (87 C. Cls. 40). That defendant made no motion for a new trial but waited from March 7, *214 1938, until the termination of a long and intricate patent accounting- and now raises this issue for the first time, is contrary to orderly and expeditious procedui-e.
The alleged inconsistency as stated by the defendant is that the court, having held that the Government had an implied license under the Shearer launching barge patent, should have held also that the defendant had a right to use the revetment structure covered by the revetment patent.
Defendant bases its argument upon the principle that where the owner of a patent grants or sells to a licensee the right to use a patented machine, the grant carries with it, by necessary implication, a license under any other patent of the licensor which would be infringed by the operation of the machine. Such established principle is of itself sound and there are numerous cases which hold that one who has sold material or granted a license for a valuable consideration to another cannot prevent the buyer from making use of that which has been sold to him.
This principle, however, finds no application in the present situation, because Shearer did not sell or grant any license to the Government. This court in its former opinion merely held that Shearer was estopped to assert his launching apparatus patent because the details covered by the valid claims therein were developed at Government expense, the Government therefore inferentially obtaining a shop right or implied license to use the launching apparatus.
This case is one involving the apportionment of patent rights between employer and employee, pursuant to a special act which directed the court to take into consideration a* * * to what extent said inventions or any of them were discovered or developed during the working hours of his [Shearer’s] Government service, and * * * to what extent the expense of making experiments, trials, and tests for the purpose of perfecting said inventions was paid by the United States * *
This case is therefore not the usual case involving a vendor and a vendee, and there is no inconsistency in the former opinion of this court, in holding that the plaintiff was entitled to recover on the revetment patent. '
We next take up the Shearer revetment patent to which *215 the present accounting relates. While the plaintiff’s developments, as compared to the background of the prior art, are set forth in much detail in the various findings of fact, a summarization appears to be necessary for a consideration of the remaining issues.
Revetments are structures that are subaqueous in character and are customarily sunk in a river over the underwater portion of the bank. They are usually located on a river bend, and their purpose is to prevent the river current, which impinges against the bend, from eroding the bank. They have been used extensively on the Mississippi River and the present accounting deals with revetments on that river. The best known and perhaps the oldest type of revetment is that known as the willow mat revetment. These consist of bundles of willow either woven or wired together in the form of a raft, which are placed in position and Sunk by means of stone ballast scattered over the entire surface of the mat.
From time to time improvements have been attempted in revetment structures, and the use of concrete has been suggested in the prior art. In March of 1908 a Canadian patent was granted to Hawkes for an articulated concrete revetment. In its prior opinion and findings of fact this court referred to the Hawkes Canadian patent as the closest approximation in the prior art to the construction of the Shearer revetment patent. Hawkes disclosed a flexible reinforced concrete revetment mat formed of individual blocks each having its reinforcing wires extending beyond the blocks and formed into loops through which an anchor cable was passed.
The Hawkes structure would be effective once it was in place on the river bottom, and the court so found, but there was no disclosure of any launching cable or equivalent handling device incorporated in the structure by means of which the revetment could be placed.
This is borne out by subsequent developments and the record shows that a pamphlet entitled “Crown Flexible Rip-Rap — The Hawkes System” was received by Major Schulz of the United States Corps of Engineers, in 1910. Irrespective of whether Major Schulz obtained his original sugges *216 tion from the Hawkes disclosure, the Government had Major Schulz conduct experimental work from 1910 to 1912 with articulated concrete mats referred to as the “Schulz construction.” (See Finding 8.) These mats were similar to the Hawkes construction in that they were flexibly connected to each other by means of pins, bolts, or an anchor cable extending through the eyes of adjacent blocks.
The experiments were limited to the use of the mats either on the river bank above the water line or in very shallow water imm ediately adjoining. In the first instance, the blocks were placed in situ and then subsequently linked together, and in the latter instance they were placed on planks extending some 10 or 12 feet out from the river bank. When the blocks had been placed in position and had been connected together, the barge was then pulled out into the river, permitting the planks and blocks to fall into the water.
Major Schulz, when testifying in the case, when asked if this was a convenient way of launching mattress, answered, “It was practically the only way I knew of.” The Government spent, some $26,500 on these experiments and then abandoned them.
The Schulz construction, however, was described in a printed publication, “Engineering Record,” of June 7, 1913, and therefore became a part of the prior art. This publication was listed in Finding 36 of the court’s former findings of fact and was considered by the court at that time, for the initial sentence of Finding 37 states as follows:
Of these publications and patents mentioned in the foregoing finding, the Canadian patent to Hawkes No. 110,571 (defendant’s exhibit 97) is the closest approximation in the prior art to the construction of the patent in suit.
Other than the Schulz experiments just referred to, the only form of concrete revetment used by the defendant was that known as “slab concrete,” in which a plurality of monolithic concrete slabs was separately placed in final position, either abutting or overlapping each other. The cost of building and sinking a unit of this type of revetment, however, was much higher than the cost of similar sized units of either *217 the articulated concrete or the willow mat revetment. (See Finding 11.)
As compared to the background of prior art just discussed, the record tells a different story with respect to the Shearer construction. On or about October 6,1914, the plaintiff submitted to the district engineer officer an exact and detailed description regarding the method of constructing concrete mats and mattresses, apparatus for their molding, and the mechanism for their launching, together with a discussion as to their availability for subaqueous revetments instead of fas-cine mattresses. Experiments were begun with the Shearer type of revetment in 1915, and the ultimate result was that between February 29, 1916, the date of issuance of the Shearer revetment patent, and February 28, 1933, the date of its expiration, the Government saw fit to use on the Mississippi Fiver 887,981 squares of articulated concrete revetment of this type at a total cost or investment of $12,524,-620.40. These figures, obtained during the accounting, amplify the correctness of the court’s former opinion and its former findings of fact in which the court stated, with respect to the revetment construction covered by the claims in suit of the Shearer revetment patent, that it “was capable of being launched in an inexpensive, relatively quick, and completely reliable manner, even in strong currents and deep water, whereas those of the prior art were not.”
We have made this comparison not for the purpose of sustaining validity, which we have already determined, but in connection with the method used in the accounting and to which defendant objects. The defendant urges that the Shearer revetment patent was not for an articulated concrete mat per se, but that his invention was merely an improvement over the prior art mat such as the Hawkes mat,, and that it only consisted in the improved method of attaching the launching cables to the concrete blocks. On this basis defendant urges that plaintiff has ignored the established rule of apportionment, which places upon a plaintiff’ in a patent accounting the burden of apportioning the value-of that part of the structure covered by his invention as-against that which was open to defendant to use, and that *218 plaintiff having failed to properly apportion the value of the cables and their attachment to the launching blocks, has failed to establish a satisfactory basis for an accounting.
While we have used apportionment in the accounting as between the revetment patent and the launching apparatus patent, to which the defendant contributed, we do not think that the apportionment rule applies to the groups of elements specified in claims 8 and 6 of the Shearer revetment patent. These claims cover a novel combination of. elements, even though some of them are individually old. There is here no basis for an attempt to segregate patented elements from unpatented elements. The pith of the invention is the entire cooperative combination and not some special details of construction. The Hawkes mattress was not of any value to the Government because its construction was such that it could not be laid in deep water and swift current. The combination of elements expressed in the claims of the revetment patent, to quote from our former opinion in this case, “solved the problem” and thus enabled subaqueous articulated concrete revetments to be used.
This case therefore comes within the entire value rule in which the salability or utility of an article is primarily due to the improvement imparted to the combination. See Hurlbut v. Schillinger, 130 U. S. 456; Crosby Valve Co. v. Safety Valve Co., 141 U. S. 441; Piaget Novelty Co. v. Headley et al., 123 Fed. 897.
In the Hurlbut v. Schillinger case, above cited, the patent was directed to a concrete pavement laid in detached blocks or sections, so that one section could be removed without disturbing the adjacent sections. Concrete pavements were in themselves old, but the Supreme Court said, with respect to the sectionalizing of concrete pavements that—
The invention of Sehillinger was a very valuable one. The evidence is that it entirely superseded the prior practice of laying concrete pavements in a continuous, adhering mass. * * * It clearly appears that the defendant’s concrete flagging derived its entire value from the use of the plaintiff’s invention, and that if it had not been laid in. that way it would not have been laid at all.
*219 The method of computation herein used in arriving at a reasonable compensation consists in (1) arriving at an average monetary advantage per square of articulated concrete fabricated and sunk during the accounting period; (2) apportioning such monetary advantage between the revetment patent here in issue and the launching apparatus patent which the Government by virtue of its contribution is entitled to use, and (3) ascertaining from the total monetary value of the revetment patent to the Government what proportion thereof constitutes a just and reasonable compensation to plaintiff. See Olsson v. United States, 87 C. Cls. 642, 659, quoting from Mamie C. Wood et al. v. United States, 36 C. Cls. 418, 426:
But this court, in the leading Case of McKeever, (14 C. Cls. R., 396; affirmed by the Supreme Court, see 18 id., 757), laid down a sufficient rule for such cases. The question to be determined is, What was the invention worth in the market? What would the parties have taken and paid if the matter had come to an express agreement? What would any person needing the invention have been willing to pay for it? * * *
See also Robinson on Patents, Vol. III, sec. 1062—
There is no presumption, either of law or fact, that the plaintiff has lost all that the defendant has gained, or that the defendant’s advantage is equal to the plaintiff’s loss. But the pecuniary benefit which the defendant has derived from the unlawful use of the invention, whether by an increase in the quality of his products and the quantity of his sales, or by a decrease in the expense of manufacture, is a fact from which, in connection with other facts, the jury may infer the amount by which the plaintiff’s sales and prices have been reduced through the infringement.
The standard of comparison used in the present case is the willow mat revetment which is the type most extensively used by the Government during the accounting period and which also is next lowest in cost to the concrete revetment. A stipulated set of figures giving the number of squares of each type of revetment, their cost of fabrication and their cost of sinking in the various districts on the Mississippi River, on an annual basis, forms the basis for the comparison.
*220 In order to arrive at an average relative cost value between the willow mat and the concrete revetment, a comparison has been made in a tabulation contained in Finding 13. This comparative tabulation is limited to those revetments of both types laid in the same district and in the same fiscal year, thus limiting as far as possible annual variations, in labor costs, and material costs. The costs during the accounting period for each type of revetment have been to-talled and divided by the number of squares, and show by comparison that the articulated concrete revetment averaged 84 percent of the cost of the willow mats during the entire accounting period.
Both the defendant and plaintiff object to this method of obtaining the comparative cost. Defendant urges that such tabulation should also contain cost figures for years and districts in which willow mats were laid and no concrete mats were made, or vice versa. This, in our opinion,, does not give as true a comparison as the one which we have utilized and which tends to limit variations in both labor- and material costs. Plaintiff, on the other hand, urges that the comparison should be limited to figures involving the same number of mats in a year. As illustrative of plaintiff’s-suggested method, 8,063 concrete mats were laid in the Vicksburg District in 1917 at a cost of $57,676.04 and in the same year and the same district 54,410 willow mats were laid at a cost of $388,789.24 Plaintiff urges a comparison which would only involve 8,063 willow mats. Needless to say, defendant’s suggested method would lower the comparative cost ratio between the concrete and willow mats, and plaintiff’s suggested method would raise the cost ratio. We think it to be correct, for the purpose of obtaining merely an average relative cost for the entire accounting period, to make our comparison on what ivas actually done and to the cost and number of mats actually laid in the same year and in the same district.
As set forth in the tabulation in Finding 7, the Government laid during the accounting period a total of 887,981 squares of articulated concrete revetments at a total cost of $12,524,620.40 or at an average cost of $14.10 per square. Application of the comparative percentage value of 84 per *221 cent to this cost per square gives a resultant saving in the combined cost of manufacture and cost of sinking of $2.68 per square due to the use of the Shearer revetment patent and the Shearer launching apparatus patent. Due to the inherent advantages of the concrete mat over the willow mat and its lack of inorganic and buoyant material (see Findings 17 to 20) we have added to this savings in cost, the sum of 32 cents per square, thus giving a fair and reasonable average total monetary value per square for the benefits derived by the United States of the two Shearer inventions of $3.00 per square.
The tabulation given in Finding 7 shows an average relationship throughout the accounting period between the cost of fabrication of the mats and the cost of sinking the mats of 60.4 percent to the cost of fabricating and 39.6 percent to the cost of sinking. Using these same figures as a basis for apportionment of the $3.00 per square as between the revetment patent and the launching apparatus patent, which the Government by virtue of its contributions is entitled to use, we arrive at the sum of $1.81 per square of articulated concrete revetment as the average monetary advantage to the Government due to the revetment patent.
Upon the record in this case, we are of the opinion that a fair and reasonable compensation to plaintiff should be based on 20 percent of $1.81 per square, or the sum of $0.36 per square. This value, as applied to the 887,981 squares used during the accounting period results in the sum of $319,673.16, and constitutes a reasonable and entire compensation to plaintiff for the use by the United States of the Shearer revetment patent, together with interest at 5 percent on this amount, not as interest but as part of the just compensation, this interest to be calculated in accordance with the periods and amounts specified in the tabulation in Finding 22.
In its former decision in the present case (87 C. Cls. 40) the court held that—
The report of the Committees having under consideration the special act in this case indicates that Congress intended no more than to refer the case to this court to be adjudicated as other patent cases are under patent law.
*222 Interest is therefore included not as interest but as part of the entire compensation in accordance with Harry F. Waite v. The United States, 69 C. Cls. 153; 282 U. S. 508.
Judgment is rendered accordingly. It is so ordered.
MaddeN, Judge; and Littleton, Judge, concur.
Jones, Judge; and Whitaker, Judge, took no part in the decision of this case.